IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| C.M.. b/n/f Michael and Suzanne Murphy §<br>    Plaintiffs, §<br>§<br>v. §<br>NORTHSIDE INDEPENDENT §<br>SCHOOL DISTRICT, §<br>    Defendant § | | Civil Action __5:21-cv-123_____ |

## PLAINTIFFS' COMPLAINT WITH JURY DEMAND

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Michael and Suzanne Murphy a/n/f of C.M. (hereinafter referred to as the and all collectively as the "Plaintiffs") complaining of the Northside Independent School District (hereinafter referred to as the "Northside ISD" or "the School District") and files their *Complaint and Jury Demand* arguing the School District violated the constitutional and statutory rights of C.M., all as more fully specified below. Plaintiffs reserve the right to replead this *Complaint* if new claims and issues arise upon further development of the facts, as permitted by law. In support thereof Plaintiffs would respectfully supplement with the following

### I. NATURE AND PURPOSE OF THE ACTION

1. When families send their children to public school they have a reasonable expectation that the School District will help send there child home at the end of the school day, in as good, if not better condition, than when they left that morning. That did not happen with C.M. In July of 2019 the District hired a teacher named Sarita Shanley to coach the Cheer Leading Team. She was woefully unprepared. On one blistering hot day in July of 2019 C.M. and another teammate were about 30 minutes late for practice. Shanley decided to punish the entire group with an excessive punishment. Twenty (20) "frog jumps" for each minute late. There was no

water to drink and no significant break time.  Shanley stopped the torment after at least 150 jumps.  C.M. experienced severe dehydration, damage to a thigh muscle, an excessive amount of proteins released into her blood system, severe kidney damage and six days in the hospital.  The diagnosis was Rhabdomyolysis. As a result C.M. now has an Autoimmune Disorder that will often cause welts to develop on her body.  While in the hospital Shanley visited C.M. to apologize and admitted she no longer coached because there were too many injuries that occurred.

2. In any case, on that day in July of 2019 C.M.'s life changed forever. Accordingly, Plaintiffs bring forth civil rights claims pursuant to the Constitution of the United States and the statutes promulgated thereunder, to remedy the acts and omissions of the School District Defendant.

## II.  JURISDICTION

3. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §1331 and 1343 because the matters in controversy arise under the Fourteenth Amendments to the United States Constitution and the laws of the United States.

## IV.  VENUE

4. Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs' claims occurred in the Western District of Texas, San Antonio Division.

## V.  PARTIES

5. C.M. is a citizen of the State of Texas, and at all pertinent times, a student at the Northside Independent School District.  Her father is Michael Murphy and mother is Suzanne Murphy. They sue in their capacity as next friends. They live in Boerne, Kendall County, Texas.

6. Defendant Northside Independent School District is a school district organized under the laws of the State of Texas. Northside ISD was at all pertinent times responsible for the care, management and control of all public-school business and transportation vehicles within its jurisdiction, the hiring, training and supervision of teachers at the School as to safety and supervision of students with and without disabilities within the district. Defendant Northside ISD may be served through its Superintendent, the Honorable Dr. Brian T. Woods, Superintendent at the Administrative Offices at 5900 Evers Road, San Antonio, Texas 78238. Plaintiffs reasonably believe the District will be represented by the Honorable Craig Wood, Attorney with the Law Firm Of Walsh, Gallegos, Trevino, Russo & Kyle, P.C., 100 NE Loop 410, Suite 900, San Antonio, Texas 78216

### VI.  STATEMENT OF FACTS- SAFETY IN SCHOOLS

A. STANDARDS OF THE UNIVERSITY INTERSCHOLASTIC LEAGUE

7. The State Legislature contemplates that the physical health of student are paramount. Among many other things, Texas Education Code §33.204 states that a School District may not encourage or permit a student participating in the activity to engage in any unreasonably dangerous athletic technique that unnecessarily endangers the health of a student..

8. The University Interscholastic League (UIL) was created by The University of Texas at Austin to provide leadership and guidance to public school debate and athletic teachers. The purpose of the UIL is to organize and properly supervise contests that assist in preparing students for citizenship. It aims to provide healthy, character building, educational activities carried out under rules providing for good sportsmanship and fair play for all participants.

9. In accord with state law, UIL Subchapter E, Section 21 enumerates the responsibilities of a School District's Superintendent. Among other things, the Superintendent of a member school

district shall educate UIL student participants, coaches and other appropriate persons on UIL rules, regulations and practices that could affect them, and monitor the school's compliance with UIL rules.

B.     SCHOOL BOARD POLICIES AND PROCEDURES

10. In concert with the above, the Northside ISD has adopted a policies called FM (LEGAL) [STUDENT ACTIVITIES]. Among other things it requires students who participate in extra-curricula activities to be trained in recognizing the symptoms of catastrophic injuries, heatstroke and dehydration. The Superintendent must keep a record of such training. In addition, and in concert with both state law and UIL standards "A coach, trainer, or sponsor for an extracurricular athletic activity may not encourage or permit a student participant to engage in any unreasonable dangerous athletic technique that unnecessarily endangers the health of a student." There is a list of minimal safety requirements that assure that each student is adequately hydrated and heatstroke prevention materials are readily available.

11. Importantly, physical education staff, nor any other school or community personnel working in the school, are permitted to use physical activity/physical education as punishment. [FFA (Regulation)].

12. Additionally, there is a policy called DMA (LEGAL) [PROFESSIONAL DEVELOPMENT REQUIRED STAFF DEVELOPMENT] which and among many other things, addresses the need for coaches or sponsors for an extracurricular athletic activity to satisfactorily complete an extracurricular activity safety training program.

13. There is an associated policy called DMA (LEGAL) [PROFESSIONAL DEVELOPMENT-REQUIRED STAFF DEVELOPMENT] that addresses Trauma-Informed Care stating that a

district's efforts to increase awareness and implementation of trauma-informed care must include training to new and existing employees.

C.   BOYS AND GIRLS SPORTS AT NORTHSIDE ISD

14. It is important for professional staff to know, not only the obvious that boys and girls are different, but they are different in critical ways in effecting how physical education class is provided.  For instance, the weight of the lungs and vital capacity in girls is about 1/3 that of boys. The heart of a girl is usually smaller than it is for a boy.  By extension girls have fewer red blood cell corpuscles per cubic millimeter of blood than boys.  In addition, the vital organs in females located above the diaphragm are relatively smaller and the ones below are relatively larger than the same for males, resulting in a lower center of gravity for females. In a related vein the metabolic process is carried out more slowly in girls than boys.

15. More specifically, females generally have greater body fat than males; that females pump out approximately 30% less oxygenated blood than males; that males have 6% more blood cells, and 10-15% more hemoglobin (the molecule that carries oxygen in red blood cells); that female VO2 volume is 15-25% lower than it is for males; that it takes longer for females to sweat-effecting heat tolerance; that females rely more on fat and men rely more on carbohydrates-which is particularly important when a female is pre-, post and during menstruation and that females are more likely to sweat out excess sodium and into their muscles for energy than does a male.  Upon reason and belief Plaintiffs contend the School District does not provide necessary training to staff about the unique needs of female student athletes.

16. Notwithstanding the different needs of female and male students the Northside Independent School District protects boys more than girls.  For instance, a significant portion of its budget centered around boy's sports, including and especially football.  In concert with such an

investment the District provides a significant amount of safety support, commensurate with the propensity for a football player to experience a concussion or dehydration during practice or a game. Of course this includes coaches who are trained and are knowledgeable in conditioning. The coaches know not only when enough is enough, but to also let the athletes stop to take breaks and water breaks. The coaches also would know what appropriate punishments are correct for the students and when to stop. Moreover, the School Board in concert with University Interscholastic League ("UIL") standards of care monitor practice and games techniques to assure they are safe.

17. It is now well-known throughout the educational and cheerleading communities that Girl's Cheerleading has a significant propensity for serious injuries. Yet the School District does not provide sufficient staff to monitor practice. Nor do they, upon reason and belief, provide necessary training to staff teaching cheerleading. Nor does the District provide corrective measures during practice. Nor do they monitor practice and performance activities to assure they are in concert with state law, UIL Standards, School Board Policies & Procedures and professional standards of care. In summary the District does almost nothing to make the cheerleading experience for girls as safe as the football experience is for boys, especially as to issues of hydration and types of exercises and their effects upon boys and girls differently.

## VI. FACTUAL RESUME ABOUT C.M.

A. ABOUT C.M. AND THE CHEERLEADING PROGRAM

18. C.M. was born in January of 2004. At all times relevant to this case, she was a student at the Clark High School with the Northside Independent School District ("Northside ISD"). Also, during the relevant time period giving rise to this cause of action she was participating in the all-girl High School Cheer Program.

19. In early July of 2019 the team was preparing for a University of Texas- San Antonio Cheer Leading Camp for the following week of July 15, 2019.

20. Practices started in the morning but the heat and humidity was still stifling. In fact that day the temperature was already in the 95-100 Fahrenheit range.

21. There were no five (5) gallon water jugs around the practice area for the girls like there were for boys football practices.

22. In fact, there was no water around at all. The closest water was in the gymnasium.

23. Nor was there any training staff nearby for the girls like there were for boys football practices.

24. On July 9, 2019 a new Coach, Ms. Shanley had the team run a mile.

25. There were no water breaks for the girls like there are for the for boys football practices.

26. C.M. was a little late to practice that morning. She was driving home from a family trip from Houston where she was visiting her father.

27. Another teammate was also about 30 minutes late to practice.

28. C.M. had completed all 4 laps around the track when Coach pulled her and C.M. was made to do a series of Frog Jumps[1] because of her lateness and that of her fellow cheer student.

29. The Coach told the girls that the rule was 20 frog jumps for every minute a girl was late. The team began the series of frog jumps.

---

[1]. Sit in a deep squat position with your legs slightly wider than a shoulder-width apart. Keep your face front and your shoulders back. Place your feet on the ground so the toes are turned out at an angle – as if you were a resting frog. Let your hands slightly touch the floor. In order to accomplish a set of leapfrog exercises correctly and safely, make sure you sit on your heels and don't put too much weight on the toes. Then on the exhale jump forward and up into the air, trying to leap as high as you can. While you are in the air, there should be triple extension – three joins (hips, knees, and ankles) are to be involved in the movement. Lightly land on your feet back to the starting position, inhale as you squat back.

30. The team had never completed an exercise like this ever before. As noted above it was already close to 95-100 degrees Fahrenheit. Moreover, without any water breaks this exercise set was even more excruciating. C.M. began to suffer the effects of the exercise, heat and lack of water.

31. Also, if any one girl was not in the proper squat position, the others on the team needed to hold the squat until the rest of the girls were in the proper position. Once the girls were done, they had completed well over 150 frog jumps. The Coach would later mention that they were lucky that they didn't have to do 600.

32. During this intense punishment, C.M.'s began to experience excruciating pain in her legs. Her top leg muscles became extremely sore. She tried to push through the pain and exercise, but began feeling very, very sick.

33. The coaches were now wedll-aware of the effects of the exercise set on C.M. but were not concerned about her health at all. In fact, one continued to scolded her. C.M. then lost feeling in her legs and vomited at the end of practice.

34. Even then no one looked to (re)hydrate C.M.

35. No one contacted a trainer or nurse. Of course, none was around.

B. C.M.'S PHYSICAL CONDITION DETERIORATED

36. C.M. was able to get home and tried to re-hydrate and rest for the remaining of the day but the damage was already done. Within a day her urine started to become very dark. The leg pain continued to worsen. She was unable to easily go down the stairs in her house. Her thighs began to swell. Finally, her parents rushed her to an Urgent Care facility.

37. While there the physician diagnosed C.M. with Rhabdomyolysis[2]. The doctor's explained that this was due to severe muscle injury. Further, she should continue to hydrate and push fluids, and not participate in any physical activity. She was permitted to return home.

38. Unfortunately, her condition to a turn for the worse. She again became sick and vomited. Her father decided to take her to the nearest emergency room where her blood was immediately taken. Staff determined that C.M. was now in a very serious critical condition and needed to be transferred to a children's hospital.

39. An ambulance was called and C.M. was transferred to Methodist Children's hospital. C.M. was hospitalized for a total of six (6) days and five (5) nights. C.M.'s Doctors were shocked when they saw her blood work. The Doctors have said that they have never seen a case of *rhabdo* as bad as C.M.'s. She is lucky to still be alive.

40. During her stay at the hospital Shanley visited C.M.. She apologized to C.M. for her injuries and that she had no idea this type of injuries could occur, She also stated she was no longer doing cheerleading training was because of the injuries C.M. had suffered. Shanley also admitted that she had left her coaching position previously due to the injuries that students had in the past.

41. Upon reason and belief C.M. believes Shanley was not correctly trained by the School Board in how to address the unique and individualized needs of female athletes like C.M.

42. Upon reason and belief C.M. believes Shanley was not correctly supervised by the School Board in how to address the unique and individualized needs of female athletes like C.M.

---

[2]. Rhabdomyolysis is a serious syndrome due to a direct or indirect muscle injury. It results from the death of muscle fibers and release of their contents into the bloodstream. This can lead to serious complications such as renal (kidney) failure. This means the kidneys cannot remove waste and concentrated urine. In rare cases, rhabdomyolysis can even cause death. However, prompt treatment often brings a good outcome.
https://www.webmd.com/a-to-z-guides/rhabdomyolysis-symptoms-causes-treatments#1

43. Upon reason and belief, C.M. contends that if she had been provided the same practice benefits as her male peers; i.e., trained staff, access to water buckets, regular water breaks, knowledge about physiology and access to emergency trainers, among other things she would never have been injured in the first instance.

D. C.M.'S CURRENT MEDICAL CONDITION AND DAMAGES

44. C.M. was finally discharged and allowed to continue her recovery at home. C.M. still has lingering effects of the Rhabdomyolysis. A few days after being discharged, C.M. developed large welts over her body that did not look like they were going away. During C.M.'s recovery, her mother noticed welts on her legs that they could not get under control. C.M.'s mother made an additional Doctor's appointment where they drew blood and took a biopsy.

45. The results of the biopsy confirmed that C.M. now suffers from an Autoimmune response due to the stress from her injury that is directly linked to Rhabdomyolysis . Being a young girl, having these welts all over her body and face cause her immense stress, further raging her auto immune disorder, just putting C.M. into a "Merry Go-Round" of emotions and stress.

46. Since this injury, C.M. has fractured her wrist twice now. She has never suffered a fractured bone prior to her hospitalization and injuries at school. Because the kidneys absorb Vitamin D, C.M. and her parents are seeking a future consultant on her kidney function. C.M.'s doctors continue to monitor and test her kidney functions to determine if her kidneys can not absorb enough Vitamin D, to keep her bones healthy and strong.

47. C.M. is still on the road to recovery. C.M. talks with a therapist due to the fact that she still has lingering fears that this will happen again. C.M. has to be extremely cautious every day. She has to make sure that she is keeping herself hydrated and that she is not over doing her exercises or even walking around in the Texas heat.

## VII. STATE ACTION

48. The Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth. In addition, each sentence and paragraph below, likewise incorporates by reference as if fully set forth herein, the one above it.

49. Northside ISD was at all times and in all matters acting under color of state and federal law when they permitted C.M.. to be subjected to the acts, omissions, wrongs and injuries hereinafter set forth.

## VIII. UNCONSTITUTIONAL POLICIES, PROCEDURES, AND PRACTICES

A. RIGHT TO DUE PROCESS

50. While in a public school C.M. has a constitutionally protected right to life, liberty and the pursuit of happiness, pursuant to the *Due Process Clause* of the 14th Amendment to the United States Constitution.

51. The Northside Independent District by and through its School Board, acting under color of law and acting pursuant to customs and policies of the District, deprived C.M. of rights and privileges secured to her by the Fourteenth Amendment to the United States Constitution and by other laws of the United States as noted in this section.

52. First and foremost the School District never should have hired Shanley to coach based upon her previous history of injuring students during cheerleading and other physical exercise activities.

53. Notwithstanding, the enactment in state law and regulations that are reflected in the Texas Education Code, UIL Directives, School and Board Policies and Procedures and operative professional standards of care, the School Board of Defendant School District has failed to train Shanley and other staff about the law, their duties and responsibilities thereunder, regulations related thereto and professional standards of care for providing exercises for female students.

Such failures, rise to the level of a violation of the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

54. Additionally and/or alternatively, the School Board of the Defendant School District has failed to supervise its staff as to the law, their duties and responsibilities thereunder, regulations related thereto and professional standards of care for female athletes Failure to supervise its staff also rises to the level of a violation of the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

B. RIGHT TO EQUAL PROTECTION

55. The United States Constitution provides that no state shall deny any person within its jurisdiction the equal protection of the law.

56. The Texas Constitution provides that "all free men...have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges." Texas Constitution, art. 1, section 3.

57. C.M. was not accorded appropriate treatment based upon her sex, gender and gender stereotypes as compared to her male peers.

58. The acts and omissions by Sharita Shanley and School District Staff when failing recognize her unique needs as a female student athlete violated her rights pursuant to the Equal Protection Clause of the Fourteenth Amendment, for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

IX. **CLAIMS FOR RELIEF UNDER TITLE IX OF THE EDUCATIONAL ACTS OF 1972**

59. Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373, as amended, 20 U.S.C. § 1681 *et seq.*, ("Title IX") specifically notes that a public entity may be liable under Title IX for discrimination based upon gender or gender stereotypes. The claimant must be a member of a protected class; must be treated differently because of membership in that class; the Respondent entity must be on notice as to the allegations; be deliberately indifferent to those allegations and the victim must have experienced a deprivation of educational opportunities and/or other damages. C.M. easily satisfies all these threshold requirements.

60. Here C.M. was not provided an instructor familiar with the unique safety needs of female student athletes while male students athletes, including and especially those related to football, are provided a full array of fully trained exercise and medical staff.

61. Further, and in a related vein, the acts and omissions of the School District Respondent stand in sharp contrast to the safety measures that boys' sports receive, like football where are significant safety features to guard against a male student getting a concussion and dehydration, such difference creating a separate cause of action for violation of Title IX thereby.

### XIII. RATIFICATION AND RESPONDEAT SUPERIOR

62. The Defendant Northside Independent School District School Board ratified the acts, omissions, customs and practices of school district personnel and staff.

63. As a result, the Defendant Northside Independent School District is responsible for the acts and omissions of staff persons who were otherwise responsible for the safety of each student pursuant to the theory of Respondeat Superior.

### XIV.   PROXIMATE CAUSE

64. Each and every, all and singular, of the foregoing acts and omissions, on the part of a Northside Independent School District, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XV.  DAMAGES

65. As a direct and proximate result of the School District Defendants' conduct noted herein, C.M. has suffered injuries and damages, including but not limited to the following:

   a. Equal access to educational opportunties;

   b. Reasonable medical care and expenses in the past;

   c. Reasonable medical care and expenses in the future;

   d. Physical pain and suffering in the past;

   e. Physical pain and suffering in the future;

   f. Mental anguish in the past;

   g. Mental anguish in the future;

   h. Physical impairment in the past;

   i. Physical impairment in the future;

   j. Disfigurement in the past;

   k. Disfigurement in the future;

   l. Out-of-pocket expenses incurred by the family and

   m. Loss of scholarships;

   n. Loss of earning capacity.

66. By reason of the above subject of this lawsuit, Plaintiffs have suffered losses and damages in a sum within the jurisdictional limits of the Court and for which this lawsuit is brought.

## XVI.  PUNITIVE DAMAGES

67. The acts and omissions and of School District Defendant if true, amount to deliberate indifference. These acts and omissions of the Defendant School District, satisfy criteria for punitive damages, as contemplated by Section 1983.

## XVII. COSTS OF REPRESENTATION AND ATTORNEYS FEES

68. It was necessary for Plaintiffs to hire the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiffs are entitled to an award of attorney fees, taxable costs and expert fees under 42 U.S.C. §1983, §1985 and §1988(b) and Title IX the ADA pursuant to 42 U.S.C. §2000d *et seq*.

## XVIII. DEMAND FOR JURY TRIAL

69. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against the Defendant Northside Independent School District, in the manner and particulars noted above, and in an amount sufficient to fully compensate them for the elements of damages enumerated above, recovery of attorney's fees and costs for the preparation and trial of this cause of action, and for its appeal if required, together with pre- and post-judgment interest, and court costs expended herein, and for such other relief as this Court deems just and proper whether at law, or in equity or both.

Respectfully submitted,

Cirkiel & Associates, P.C.

/s/ Mr. Martin J. Cirkiel, Esq.
Mr. Martin J. Cirkiel
SBN: 00783829
Federal Bar No. 21488
marty@cirkielaw.com

        Cirkiel & Associates, P.C.
        1901 E. Palm Valley Blvd.
        Round Rock, Texas 78664
        (512) 244-6658 [Telephone]
        (512) 244-6014 [Facsimile]; and

        Mr. Anthony O'Hanlon, Esq.
        Attorney & Counselor At Law
        SBN: 15235520
        111 South Travis Street
        Sherman, Texas 75090
        (903) 892-9133 [Telephone]
        (903) 957-4302 [Facsimile]
        ahanlon@somlaw.net [Email]

        **ATTORNEYS FOR PLAINTIFFS**